**Andrew D. Cotlar, Esq. /Attorney I.D. #204630**
**Law Office of Cotlar & Cotlar**
**23 West Court Street**
**Doylestown, PA 18901**
**(215)-345-7310**

*Attorney for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **Mark Holbrow,** | : NO.  2:21-cv-819 |
| *Plaintiff* | : |
| **VS.** | : |
| | : |
| **MyLife.com, Inc.** | : CIVIL ACTION – LAW |
| *Defendant* | : |

PLAINTIFF'S REPLY MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION

FOR SUMMARY JUDGMENT REGARDING ARBITRATABILITY

I.      **Counter Statement of Facts**

Plaintiff has worked with Defendant to stipulate by affidavit and through other means to agree to a common set of facts agreed to by the parties.  Therefore, Plaintiff adopts the Defendant's Statement of Facts paragraphs 1-22 as set forth in Defendant's Motion for Summary Judgment.  To the extent that such facts do not portray the entire picture of the events that are the subject of this suit, the following supplement serves as a counterstatement of facts from Plaintiff's perspective.

1.  Plaintiff, Mark Holbrow, is an adult individual who resides at 3008 River Road, New Hope, Pennsylvania, 18938.

2.  He owns and operates the Bucks County Academy of Fencing, a sport fencing athletic facility that has for 40 years been providing lessons and competitive training to all ages, including young children.

3. He substantially relies upon his reputation for personal and business development.

4. Defendant, MyLife.com, Inc. is a privately-held Delaware corporation with approximately $20 million in annual revenue with principal offices located at 1100 Glendon Avenue, Suite 720, Los Angeles, California, 90024.

5. Defendant sells consumer background reports through their website, www.mylife.com. This website allows users to run free background searches for an individual's name, and then displaying search results that imply, often falsely, that the subject of a search may have records of criminal or sexual offenses—records that can conveniently be viewed only by purchasing a MyLife subscription.

6. Defendant is presently and separately the subject of a complaint in federal court filed by the Federal Trade Commission ("FTC") and U.S. Department of Justice ("DOJ") for violations of the FTC "telemarketing sales rule," the Restore Online Shopper's Confidence Act, and the Fair Credit Reporting Act.  United States of America v. MyLife.com, Inc. et. al., 2:20-cv-06692 (U.S. Dist. Ct. C.D. Ca.).

7. Defendant has also been sued numerous times for defamation by individuals who have discovered that when their name is inputted into Defendant's website, the public results falsely indicate that the individual has a criminal record, and that only if they purchase a subscription can they discover that this is in fact not true.  MPR News, Martin Moylan, "Suit alleges firm soils reputations, then seeks money to improve them," (May 7, 2020), available at: https://www.mprnews.org/story/2020/05/07/suit-alleges-firm-soils-reputations-then-seeks-money-to-improve-them.

8. On or about January 22, 2021, Plaintiff "Googled himself" (using the "Bing" online

search engine)[1] and discovered his name listed at www.mylife.com.

9.  He followed up by clicking on the publicly available link and discovered to his horror that the website unequivocally stated the following concerning him, which is patently false:  "Criminal or Civil Court records found on Mark's Background Report."  Cotlar Affidavit, Motion, Exhibit D.

10. A follow-up of this on January 25, 2021 by his counsel (and with Mr. Holbrow's authority) confirmed the same.  See Complaint, **Exhibit A**, Cotlar Affidavit, Motion, Exhibit D.

11. Detailed information beyond this label could only be obtained by purchasing a subscription.  Cotlar Affidavit, Motion, Exhibit D.

12. The subscription page invites the viewer to "Get instant information on Mark Now!" and stated further that there are one or more "Incarceration and Public Records."  See Complaint, **Exhibit B**. Cotlar Affidavit, Motion, Exhibit D.

13. Once Mr. Holbrow's counsel subscribed, the news was revealed as follows: "Good news! After scanning the web and government sources we did not find any negative information about Mark Holbrow.  The Background Report you pulled has no derogatory entries." Specifically concerning "Criminal and Court Records," the website stated that no arrest or criminal records were found."  See Complaint **Exhibit C**, Cotlar Affidavit, Motion, Exhibit D.

14. The detailed report Mr. Holbrow's counsel purchased from Defendant, and which would be available to any member of the public, further provided Mr. Holbrow's home address, his age, his home telephone number, and his race.  Cotlar Affidavit, Motion, Exhibit D.

---

[1] "Googling" oneself is an informal term that has been adopted by popular culture and is not limited to using the search engine Google.com itself.

15. It also wrongly claimed that he was a registered Republican (he is in fact a registered Democrat), wrongly stated that his religious affiliation is Christian (which is also not accurate), wrongly inflated his actual net worth, and wrongly associated him with people he doesn't know.  Cotlar Affidavit, Motion, Exhibit D.

16. The report further confirmed that the Defendant's "reputation profile" indicated "no criminal or civil court records, lawsuits, liens or negative reviews," contrary to what it stated in its publicly available teaser. See Complaint, **Exhibit D**; Cotlar Affidavit, Motion, Exhibit D.

17. Mr. Holbrow filed suit for defamation per se and "false light" invasion of privacy in the Court of Common Pleas, Bucks County.

18. Thereafter, Defendant removed the case to this present Court.

19. The online arbitration agreement that is the subject of Defendant's Motion is available only at the webpage when one is ready to purchase a subscription and then only if one actually clicks on the blue hyper-link "Terms & Conditions" below the blue "Continue" button.  Before one clicks on the blue hyper-link, there is no reference or even implication of an arbitration requirement at this stage.  And even if one were to access those Terms & Conditions, the arbitration provision is buried at page six of a general 12-page "terms of service agreement."  Motion for Summary Judgment, Exhibit C.

20. Plaintiff's counsel stipulated that when he purchased the subscription, he did not in fact access the terms and conditions itself, which was on a separate page.  Cotlar Affidavit, Motion, Exhibit D.

21. Plaintiff's counsel agrees that Plaintiff authorized him to access the Defendant's website and purchase the subscription, and therefore pursuant to established principles of agency

law, the actions of counsel as agent bound Plaintiff as principal.

22. The central question for this Court, however, is whether the arbitration agreement was clear and conspicuous for an ordinary user.

II.     **Argument**

As a general matter, federal courts have held that so-called "browse-wrap" or "click-wrap" agreements,[2] whereby website users are impliedly bound to the contents of the user agreements posted on those websites they may access, are generally enforceable, but with important conditions.  The Third Circuit and District Courts in this jurisdiction have held that such provisions have to be **visible  and obvious**, not hidden away.  See Feldman v. Google, Inc., 513 F. Supp. 2d 229, 237 (E.D.Pa. 2007), and Spect v. Netscape Communs. Corp., 306 F.3d 17 (2nd Cir. 2002) (denying enforceability of clickwrap agreement where user had to navigate several pages to review the arbitration provision).  Notably, "**Clarity and conspicuousness** of arbitration terms are important in securing informed assent."  Spect, supra. 306 F.3d at 30 (emphasis added).

In this Circuit, the only appellate decision concerning this particular issue can be found in James v. Global Tel*Link Corp, 852 F.3d 262, 267 (3d Cir. 2017).  In *James*, the court considered the case of prisoners who used jailhouse phone services being bound by the terms and conditions available on the service provider's website, which included an agreement to arbitrate

---

[2] Contracts formed on the Internet come in primarily two flavors:  "clickwrap" agreements in which the website users are required to click on an "I agree" box after being presented with a list of terms and conditions of use; and "browsewrap" agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen. Zabokritsky v. JetSmarter, Inc., 2019 U.S. Dist. LEXIS 103557, *2-3 (E.D. Pa. 2019), n. 30, citing and quoting Nguyen v. Barnes & Noble, Inc., 763 F.2d 1171, 1175-6 (9th Cir. 2014).  The terms are basically analogies to the time when, prior to the Internet, software was delivered in boxes sealed with shrinkwrap plastic, and by opening the plastic, the user was impliedly agreeing to the terms and conditions associated with the use of the software. Spect v. Netscape Communis. Corp., 306 F.3d 17, n. 4 (2nd Cir, 2002).

all disputes.  Id. at 264.  Four of the five prisoner plaintiffs did not use the website but gained

access to the telephone system through a phone prompt system.  Id. at 264.  The District Court

refused to require arbitration for those prisoners who set up their accounts by telephone, and the

Third Circuit affirmed.

The *James* case is cited by Defendant for the proposition that the Third Circuit has

adopted the principle that "browsewrap" agreements on websites are enforceable.   And it is true

that the *James* Court did in fact state this  -- but only in dicta:

> "There is an evolving body of caselaw regarding whether the terms and conditions
>
> in browsewrap agreements are enforceable, often turning on whether the terms or
>
> a hyperlink to the terms are reasonably conspicuous on the webpage.  When terms
>
> are linked in obscure sections of a webpage that users are unlikely to see, courts
>
> have refused to find constructive notice.  On the other hand, where the website
>
> contains an explicit textual notice that continued use will act as a manifestation of
>
> the user's intent to be bound, courts have been more amenable to enforcing
>
> browsewrap agreements."

*James*, supra, at 267 (interior citations and quotations omitted).  The Court, however,

immediately stated "Here we need not consider the particular design and content of [defendant's]

website because [plaintiffs'] transaction with [defendants] occurred over the telephone."  Id.

Thus, while interesting, the discussion in *James* is merely dicta.

Defendant also cites to HealthPlanCRM, LLC v. AvMed, Inc., 458 F. Supp. 3d 208

(W.D. Pa. 2020), a non-binding case from the U.S. District Court for the Western District of

Pennsylvania.  HealthPlanCRM d/b/a Cavulus had a contract with AvMed, Inc. to manage

AvMed's customer relations management software.  This contract came to an end, and AvMed

engaged a company called NTT to transition the existing data to a new system.  To do so,

AvMed granted NTT a sublicense to access Cavulus' software.  In accessing the software, NTT

employees executed a "click-on" version of the same agreement that AvMed had agreed to with

Cavulus (NTT and its employees had no direct contract with Cavulus).  At some point Cavulus

discovered NTT employees were using the access granted to them to copy its intellectual

property.  Cavulus demanded arbitration, which NTT refused.  Cavulus thereafter filed suit for

enforcement of the agreement to arbitrate. Id. at 314-316.[3]

Citing *James*, the Court in *HealthPlanCRM* held that the agreement to arbitrate was

enforceable because NTT employees used the website that required them to assent to the

agreement through a "reasonably conspicuous" hyperlink at the log-in page.  Id. at 333.  The

Court reasoned:

> "The link to the End-User Agreement appears no more than an inch below the
>
> log-in boxes, and it is both above and set apart from the "large paragraph" of text
>
> NTT references (which is itself only six sentences long).  The link is not
>
> concealed at the bottom of a webpage or hidden in fine print.  What's more, the
>
> blue hyperlink to access the full End-User Agreement stands out against the white
>
> background of the log-in page and appears in a sentence which straightforwardly
>
> advises the user that "[u]se of Cavulus constitutes acceptance" of the linked
>
> agreement."

Id. at 333.

Yet none of this discussion was necessary for the disposition of the case, because the

Court immediately prior to this discussion had also concluded that as an independent matter, the

---

[3] In an interesting reversal of roles, it was Plaintiff who was seeking to enforce arbitration in this case, rather than Defendant.

NTT employees were bound to the arbitration agreement by principles of equitable estoppel—

wholly apart from their alleged implied consent to the browse-wrap agreement.  Here, the Court

reasoned that equitable estoppel bound the NTT employees, because they had "reaped the

benefits of a contract containing an arbitration clause."  Id. at 328.  This would prevent NTT

employees from cherry-picking the provisions of a contract that suit them while ignoring other

provisions.  Id.  Like the *James* case, the discussion in *HealthPlanCRM* concerning the validity

of clickwrap or browsewrap agreements is not necessary to the resolution of the case and is

therefore dicta.

Defendant also cites to Zabokritsky v. JetSmarter, Inc., 2019 U.S. Dist. LEXIS 103557,

*2-3 (E.D. Pa. 2019), where the Court enforced an agreement to arbitrate that was implied by an

Internet user checking a box next to a hyper link to indicate her acceptance to a membership

agreement for private jet services.  But in *Zabokritsky*, the question concerning whether the terms

and conditions were sufficiently visible and obvious was never raised by the Plaintiff and not

discussed in any detail by the Court.

Additionally, in Feldman v. Google, Inc., 513 F. Supp. 2d 229, 237 (E.D.Pa. 2007), the

Court considered a situation where a lawyer had signed up with Google's "Ad Words" program

to essentially pay each time someone clicks on well-placed advertising for his services, which

had been triggered by the entry of certain keywords.  The Court upheld an agreement to arbitrate

because when signing up for this service, the lawyer had to scroll through an online agreement

and then affirmatively click a check-off box to agree to the terms and conditions, which included

an arbitration agreement.  Id. at 231-233. The Court reasoned that "unlike the impermissible

agreement in Spect, the user did not have to scroll down to a submerged screen or click on a

series of hyperlinks to view the Agreement."  Id. at 237.  Thus, the terms were visible and

obvious.

By way of contrast, appellate courts in the federal system, such as in the early case of

Spect v. Netscape Communis. Corp., 306 F.3d 17 (2nd Cir, 2002), have held that any implied

agreement for arbitration must be clear and conspicuous to the user in order to bind that person.

In this case, then-Circuit Judge Sotomayor considered the case of users of the web browser

Netscape Communicator  and its program "SmartDownload" who had alleged that when they

first used the browser and its download program, it placed cookies and keys on their computer,

thereby reporting back to Netscape information concerning certain downloads.  The Plaintiffs

alleged this constituted unlawful eavesdropping. Id. at 21.  It was acknowledged, however, that

when the Plaintiffs proceeded to install the browser, they were automatically shown a scrollable

text of that program's license agreement and were not permitted to complete the installation until

they had clicked on a "yes" button to indicate that they had accepted all the license terms,

including a requirement to arbitrate all disputes. Id. at 21-22.  Other users who already had the

browser but wanted to download the specific program "SmartDownload" were not required to

express unambiguous assent to the program's license agreement, nor were even required to view

the license agreement. Id, at 23.  In either case, the user **was required to scroll down through**

**lengthy textual material** before they were on notice of a license agreement that, when accessed,

finally provided information about mandatory arbitration of any disputes.  Id. at 23. The Court

refused to give effect to the arbitration provision.

In reviewing the facts, the Court observed that "Clarity and conspicuousness of

arbitration terms are important in securing informed assent."  Id. at 30.  It reasoned that a

"reasonably prudent offeree in plaintiff's position" Id. at 30, would not have necessarily have

known of the SmartDownload license agreement prior to downloading it, because "a reference to

the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms." Id. at 32.

In the present case, as in *Spect*, the arbitration agreement is deeply hidden from view from the ordinary consumer.   It is nowhere clearly visible, let alone clear and conspicuous, on the initial purchase page.  As the following screen-shot shows, **at no point is there any language presented in any obvious fashion to a purchaser that the purchase is subject to agreeing to arbitrate any disputes: it only references "terms and conditions" and a "privacy policy" in blue type under the "CONTINUE" button**.



Below the blue "CONTINUE" button appears language that states, "By clicking the button above, I agree to the MyLife Terms & Conditions and Privacy Policy."  But the terms and conditions are not on this page, and **there is no reference to arbitration at this stage**. All

parties agree the arbitration clause itself is available only by clicking the hyper-link, and even then it is hidden at page six of a general 12-page "terms of service agreement."  Motion for Summary Judgment, Exhibit C.  Therefore, at the purchase page alone, where the consumer is invited to "continue," no consumer would reasonably expect to understand they were agreeing to arbitrate any and all claims.  In sum, while the blue hyper-link to the "Terms & Conditions" may have been clear and conspicuous, the arbitration clause at page six of the Terms & Conditions document itself was not, neither at the stage before purchase or even if Plaintiff were to have scrolled through the Terms & Conditions document itself.

The case would have been substantially different legally if, in the paragraph below the blue "CONTINUE" button, Defendant had provided disclosure language to the effect that "by clicking above, you agree to waive certain rights" or something similar.  This extra precaution would have prompted any reasonably prudent user to know that by accessing the website further certain rights may be waived.  In the absence of such clear and conspicuous language, an ordinary consumer of reasonable prudence would do nothing further other than click on the "CONTINUE" button.

This hypothetical alternative is not unreasonable.  Indeed, Defendant did in fact provide additional language in the paragraph immediately below the blue "CONTINUE" button that disclaimed any status of being a "consumer reporting agency" under the Fair Credit Reporting Act (FCRA).  So, providing a summary of the waivers any user would be purported to agree to at the initial stage immediately below the "CONTINUE" button would not be unexpected and would not have imposed any additional burden on Defendant.  And it would have provided clear and conspicuous additional notice or incentive for a consumer to investigate further.  In this case, Defendant felt it necessary to highlight a waiver under the FCRA in the initial language but hid

the ball with regard to arbitration.

This case is therefore more like *Spect* than the other cases that Defendant cites. Important information concerning mandatory arbitration is hidden away in a non-conspicuous portion of a 12-page license agreement that is only accessible if a consumer takes the initiative to click on a link that gives no hint or description of the contents therein.

**CONCLUSION**

Defendant peddles online lies and then profits by duping consumers into purchasing their product. In this case, lies have consequences for Mr. Holbrow, who owns a sport fencing athletic facility that has for 40 years been providing lessons and competitive training to all ages, including young children.  To the extent that Mr. Holbrow substantially relies upon his reputation for personal and business development, Defendant has damaged this reputation beyond calculation by falsely stating Mr. Holbrow has a criminal history, among other matters. When his counsel accessed Defendant's website to obtain information on these unfounded allegations, neither he nor Mr. Holbrow himself reasonably expected that he was also waiving his right to seek legal redress from the courts.

Respectfully Submitted,

*Andrew D. Cotlar*
**Andrew D. Cotlar, Esq. /Attorney I.D. #204630**
**Law Office of Cotlar & Cotlar**
**23 West Court Street**
**Doylestown, PA 18901**
**(215)-345-7310**
*Attorney for Plaintiff*

CERTIFICATE OF SERVICE

I, Andrew D. Cotlar, hereby certify that on March 17, 2022, I caused a true and correct copy of the foregoing Reply Memorandum in Opposition to be served via the Court's electronic filing system and via electronic mail on all counsel of record.

*Andrew D. Cotlar*
**Andrew D. Cotlar, Esq. /Attorney I.D. #204630**
**Law Office of Cotlar & Cotlar**
**23 West Court Street**
**Doylestown, PA 18901**
**(215)-345-7310**

*Attorney for Plaintiff*